UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

RICHARD J. McKEON, Jr.,

                          Petitioner,

          -vs-                              **No. 1:12-CV-0485(MAT)**
                                            **DECISION AND ORDER**
P.D. HEATH, Superintendent,

                          Respondent.

_____

## I.   Introduction

        Richard J. McKeon, Jr. ("McKeon" or "Petitioner") has filed a
pro se petition for a writ of habeas corpus pursuant to 28 U.S.C.
§ 2254, alleging that he is being held in Respondent's custody in
violation of his federal constitutional rights. Petitioner is
incarcerated following a judgment entered on February 27, 2009, in
New York State, Orleans County Court, convicting him, after a
guilty plea, of Manslaughter in the First Degree (N.Y. Penal Law
§ 125.20(2)).

## II.  Factual Background and Procedural History

### A.    Overview

        On March 7, 2008, the charred body of Maureen Migliore
("Migliore" or "the victim") was found along a road in the Town of
Barre in Orleans County, New York. Migliore had been strangled to
death and then doused with an accelerant and set on fire. By the
following day, the police had identified McKeon, who had been the
victims's boyfriend, as the sole suspect. On March 8, 2008, the
police executed a search warrant at Petitioner's home on Route 240

in the Town of West Valley in Cattaraugus County and seized several items incriminating him in the crime. McKeon also voluntarily made several incriminating statements to the police, although he did not expressly admit to murdering his girlfriend.

On March 31, 2008, an Orleans County grand jury charged McKeon with second degree (intentional) murder (N.Y. Penal Law § 125.25(2) and unlawful transportation of human remains (N.Y. Public Health Law § 4144(1).

### B.   The Suppression Hearing

A suppression hearing pursuant to People v. Huntley, 15 N.Y.2d 72 (1965), was conducted on July 15, 2008, and July 24, 2008. New York State Police Investigator Joshua Keats ("Inv. Keats") and Orleans County District Attorney's Office Investigator Joseph Sacco ("Inv. Sacco") testified that they traveled to McKeon's home on Route 240 to speak with him about Migliore's disappearance. After inviting the officers inside, McKeon stated that he had last seen Migliore during the afternoon of March 6, 2008. She had packed her belongings in Wal-Mart shopping bags, walked to the end of the driveway, and turned left. McKeon said he had not seen Migliore since that time.

McKeon explained that he was a police officer and had begun his day on March 6, 2008, by working at traffic court. Later that day, he went to the hospital to see his daughter, who was undergoing cancer surgery. While there, he spoke to Migliore on the

phone numerous times; they had argued because Migliore was jealous of the time he was spending with his daughter and ex-wife.

When he returned home later that night, they talked and agreed to end their relationship. After returning some jewelry to him, Migliore left his house on foot with her belongings packed in Wal-Mart bags. McKeon mentioned that Migliore's ex-husband had once poured gasoline on her and set her afire; she still had scars on her neck from that attack.

The investigators asked McKeon whether he would be willing to accompany them to the police barracks. McKeon asked if he was in trouble and inquired whether he would be permitted to return home after the interview. Inv. Sacco stated that he could not remember how he answered these questions. Ultimately, McKeon agreed to go back to the barracks with the investigators. H.9, 74.[1]

During the car ride, the investigators talked with McKeon about his career (he was a police officer at Buffalo State College) and his personal life (he was divorced and had two daughters from his previous marriage). McKeon explained that Migliore had a drinking problem, which caused tension in their relationship.

---

[1]   Citations to "H.__", "P.__", "PW.__" and "S.__" refer to pages from transcripts of the <u>Huntley</u> hearing, the plea proceeding, the hearing on the motion to withdraw the plea, and the sentencing proceeding, respectively. Copies of these trancripts have been submitted by Respondent in connection with his answer to the habeas petition.

They arrived at the barracks in Machias about 6 p.m., and McKeon was brought to an interview room. After Inv. Keats questioned the veracity of McKeon's claim that Migliore had started walking down Route 250, a busy roadway, by herself with no cell phone or money, McKeon lowered his head and stated, "I don't know what I should do now." At that point, Inv. Keats read McKeon his Miranda[2] warnings, and McKeon agreed to continue speaking with the investigators. H.24-25.

Over the next four hours, McKeon gave multiple iterations of the events of the night Migliore died, although he stopped short of admitting that he killed her. In his final, written statement, McKeon stated that when he returned home from the hospital on the night of March 6, 2008, finding Migliore highly intoxicated. She was "on [him] immediately" in a jealous rage. Migliore, who had taken off all her clothes, threatened to run to the neighbors' house and tell them he was abusing her. She asked him what his employer would think if she made such a complaint and began to throw things and smash dishes. McKeon said that Migliore spat in his face during the argument because she knew how much he hated that; he commented that "it was almost like she wanted [him] to hurt her." H.29.

McKeon stated that the next thing he remembered was Migliore lying on the floor on her stomach with her head turned to the side

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

-4-

and her eyes partially closed. McKeon remembered driving in his car, but he could not recall where and he did not know where Migliore was at the time. McKeon remembered returning home and falling asleep in his recliner.

McKeon concluded his review of his written statement at about 11:45 p.m. and excused himself to use the lavatory. When he returned, he asked whether it would be possible to keep the matter out of the media to protect his parents.

Meanwhile, New York State Police Investigator Darryl O'Shei ("Inv. O'Shei") had returned to the barracks after executing a search warrant at McKeon's house. After reviewing Petitioner's statement, he went in to speak to McKeon at about 12:25 a.m. Inv. O'Shei asked McKeon whether he, as a police officer, would believe his statement if someone presented it to him. McKeon replied, "No." H.81. Inv. O'Shei asked McKeon to try to fill in some of the gaps in his story. McKeon stated that Migliore had angrily knocked over the kitchen table. He repeated that he had blacked out, and when he came to, Migliore lay immobile on the floor. McKeon remembered getting into his car; he thought that Migliore's body must have been in the trunk. He recalled that there was a gasoline can in the trunk that he threw out the window after he removed Migliore's body from the trunk.

The conversation between Inv. O'Shei and McKeon lasted for about half an hour. Inv. O'Shei transcribed McKeon's statement from memory after he went home.

Following the suppression hearing, Judge Punch ruled from the bench that there was no basis to deem the statements inadmissible as McKeon had never been subjected to custodial interrogation and even if he had been, he validly waived his rights. H.102.

### C.   The Plea Proceeding

Just over two weeks prior to the trial's scheduled start-date, the parties appeared before Orleans County Court Judge James Punch. The prosecution conveyed the following plea offer: In exchange for McKeon's plea of guilty to first degree manslaughter in full satisfaction of the indictment, the trial court would impose a determinate sentence of no less than 15 and no more than 20 years, plus 5 years of post-release supervision. McKeon indicated that he understood the terms of the offer, and he accepted it.

During his plea colloquy, McKeon stated that on the night of March 6, 2008, he and the victim got into an argument. He said that he was trying to defend himself from her (she was trying to burn him with cigarettes) when he "just snapped . . . and went too far and apparently [he] strangled her." P.8. Judge Punch asked McKeon whether he "could have left the house rather than kill her." P.8-9. McKeon replied that he "[p]robably" could have, but "it would have taken a lot of force . . . to get passed [sic] her and get out of

the door." P.9. He conceded that he would not have been required to use "deadly force" to leave his home. P.9.

McKeon explained that he strangled Migliore with one hand by squeezing her neck for five to ten minutes and intentionally compressing her windpipe. P.9, 11-12. He did not release her until she collapsed on the ground. P.12-13. When Judge Punch asked if he intended to kill her, McKeon responded, "[y]es." P.13.

Judge Punch next inquired as to what McKeon did with his girlfriend's corpse. McKeon stated that he put it in his car and transported it somewhere in Orleans County, but he did not know the location. Then he "[d]umped her out of the car." P.13-14.

When McKeon denied having discussed a potential justification defense with his attorney, Judge Punch explained that "use of force is permitted to protect you against oncoming force from another person" but "you can't use deadly force when you still have the ability to retreat." P.15. Judge Punch added that deadly force cannot be used "unless it appears reasonably [sic] to you that deadly force is about to be used against you." P.15. Judge Punch asked McKeon whether it was "clear" to him that "self-defense or justification would not apply to what [he] did[.]" P.15. McKeon responded affirmatively and proceed to enter a guilty plea to first degree manslaughter. P.16.

### D. The Motion to Vacate the Plea

On December 3, 2008, McKeon sent a letter to the County Court in which he alleged that: (1) his attorney, the prosecutor, and the County Court had mishandled his case; (2) he was only given 15 minutes to consider the plea deal and was "forced" to lie during the plea allocution; (3) unspecified ex parte communications had occurred between the prosecutor and the court; and (4) Judge Punch should have recused himself because he was biased, had done "improper things," and was in poor health. See Respondent's Exhibit ("Resp't Ex.") A. After the prosecutor filed opposition papers, Petitioner converted his letter to a formal motion in which he additionally asserted that, in order to force him to take the plea to first degree manslaughter, his attorney had "falsely informed" him that he "would be sentenced or serve a minimum period of imprisonment of thirty-five years" if convicted of second degree murder. See Resp't Ex. C. New defense counsel was appointed, who adopted McKeon's prior filings.

On February 2, 2009, County Court Judge Robert C. Noonan denied the motion but ordered a hearing on the limited issue of whether "counsel misled [McKeon] as to the potential sentence he could have received had he exercised his right to trial." Resp't Ex. F at 2 (citation omitted). With regard to McKeon's other claims, Judge Noonan found that the plea was knowing and voluntary and that the "record belie[d] [McKeon's] current contentions that

-8-

he was forced to lie to receive a favorable plea bargain, that he had insufficient time to consider the plea offer and that counsel did not prosecute the defense in a satisfactory manner." Id. (citations omitted). Judge Noonan further found that it did not "appear from the court's inquiry and [McKeon's] own detailed recitation of the facts that any justification defense exist[ed] to the manslaughter charge." Id. (citations omitted).

On February 27, 2009, Petitioner and his newly appointed attorney appeared for a hearing on the motion to withdraw the plea and, if applicable, sentencing. McKeon at first testified that the only time he and his attorney ever discussed his sentencing exposure was on the day that he pleaded guilty. PW.7, 9. He stated that they had a 15 or 20 minute meeting in the attorney visiting area of the county jail, in which his attorney told him that his maximum sentence for a second degree murder conviction was 35 years, but if he took the plea deal, he could serve as little as 17 years, one month, and 22 days. PW.8. Apart from that conversation, McKeon stated that the only other communication from his attorney regarding sentencing came in the form of letters, the contents of which he could not describe consistently. For instance, he testified on the one hand that he did not recall what the letters said because he "wasn't interested" but later stated that the letters might have mentioned a 25-year sentencing maximum for second degree murder. PW.7, 10. Finally, however, he confirmed that

he "did have information that the maximum sentence . . . is twenty-five to life." PW.13. McKeon denied having independent knowledge of his sentencing exposure, claiming that in his 30 years as a police officer, he never investigated a homicide. PW.9-10.

McKeon's previous attorney, John Nuchereno, Esq. ("Plea Counsel"), testified for the prosecution that he had advised McKeon on "numerous" occasions of the "repercussions of a conviction for murder in the second degree[,]" including the potential sentencing exposure. PW.18-19. Plea Counsel explained that he had described McKeon's sentencing exposure as a minimum of 15 to 25 years and a maximum of life. PW.19. Plea Counsel told McKeon that "based upon the nature of the crime," he believed that the sentence could be in the range of 25 years to life. PW.19.

Plea Counsel explained that the only plea offer previously made had been to second degree murder, but in September of 2008, the District Attorney expressed an openness to resolving the case with a manslaughter plea. PW.21-22. Plea Counsel testified that he and McKeon had discussed all potential sentencing options, including that a plea to manslaughter "could guarantee his release in his early 60's" whereas a second degree murder conviction could mean "possibly dying in prison." PW.24. Plea Counsel stated that he believed that McKeon had comprehended their discussions. PW.25.

Judge Noonan denied the motion to vacate the plea from the bench, noting that McKeon's own testimony did not support his

allegation that counsel had misinformed him. PW.25. According to Judge Noonan, McKeon's testimony was so weak that he was "not even sure [Plea Counsel's] testimony was necessary." Id. In sum, Judge Noonan found, Plea Counsel provided McKeon with "accurate legal advice" and "did not in any fashion provide ineffective assistance or mislead [Petitioner] with respect to the plea. . . ." PW.26.

With regard to sentencing, the prosecutor argued that Petitioner had not accepted responsibility, and asked that in light of the nature of the crime, the maximum agreed-upon sentence of 20 years be imposed. S.31. Defense counsel asked the court to consider his client's 30-year career in law enforcement. McKeon declined to address the court as to sentencing, instead asking for permission to "preserve some points for appellate review." S.33. Judge Noonan informed McKeon that the only issues he would preserve for appellate review "revolve[d] around [his] sentence." S.33. McKeon asserted that he wished to preserve a challenge to the search warrant, to which Judge Noonan responded, "You can preserve [this issue] on appeal; you haven't waived that." S.33. Noting that McKeon's plea colloquy was "one of the most chilling things [he] . . . ever read[,]" S.34, Judge Noonan sentenced McKeon to 20 years in prison and 5 years of post-release supervision. In addition, Judge Noonan issued orders of protection as to several of the victim's relatives. S.35.

**F.    Post-Conviction Proceedings**

Petitioner, through counsel, filed a brief in the Appellate Division, Fourth Department, of New York State Supreme Court in which he argued that (1) his waiver of appeal was ineffective because his attorney and the County Court assured him at sentencing that his appellate claims were not subject to waiver; (2) the County Court misled him as to his duty to retreat during the plea colloquy, which invalidated his guilty plea; (3) the search warrant inaccurately described the subject premises; (4) the police obtained statements in violation of his <u>Miranda</u> rights; and (5) the orders of protection should be vacated because the victim's survivors were neither witnesses nor victims as defined in the relevant statutory provision.

On November 12, 2010, the Appellate Division unanimously affirmed the conviction. <u>People v. McKeon</u>, 78 A.D.3d 1617 (4th Dep't 2010). The New York Court of Appeals denied leave to appeal on February 27, 2011. <u>People v. McKeon</u>, 16 N.Y.3d 799 (2011).

This timely habeas petition followed, in which Petitioner argues that (1) he did not knowingly and intelligently waive his right to appeal; (2) his guilty plea was not knowing, intelligent, and voluntary; (3) the search warrant evidence should have been suppressed; (4) his statements to the police should have been suppressed; and (5) the orders of protection issued at sentencing in favor of the relatives of the victim should be vacated.

**III. Discussion**

    **A.   Ground One: Invalid Waiver of Right to Appeal**

At sentencing, Judge Noonan expressly advised Petitioner that he had preserved his appellate rights, including the right to challenge the issuance of the search warrant. Petitioner specifically noted on the record that defense counsel had confirmed that his appellate rights had been preserved, while the prosecutor remained silent during this exchange. However, when accepting his plea at an earlier date, Judge Punch advised Petitioner that by pleading guilty, "you will give up your right to appeal." Petitioner argues that although apparently Judge Punch was referring only to those appellate rights that are automatically forfeited upon entering a guilty plea, his explanation at the plea colloquy was ambiguous. Therefore, Petitioner argues, as he did on direct appeal, such a general waiver of appeal was ineffective regarding the appellate rights that routinely survive a guilty plea.

The Appellate Division upheld the appellate-rights waiver, observing that the record of the plea proceeding established that McKeon "'understood that the right to appeal [was] separate and distinct from those rights automatically forfeited upon a plea of guilty' and that his waiver of the right to appeal was knowingly, voluntarily, and intelligently entered." McKeon, 78 A.D.3d at 1617 (quotation omitted).

McKeon relies on a line of New York state court cases holding that a general waiver of appeal is invalid if the court fails to distinguish on the record between those rights automatically forfeited upon entering a guilty plea and those rights that survive. E.g., People v. Lopez, 6 N.Y.3d 248, 257 (N.Y. 2006). Thus, under New York state law, advising a defendant that when he pleads guilty, he waives his right to appeal, has been deemed an insufficient inquiry to ensure that the defendant's waiver was knowingly and voluntarily given. Id. at 257; see also People v. Cain, 29 A.D.3d 1157, 2006 N.Y. Slip Op. 03939, at **2 (3d Dep't 2006) (finding waiver invalid where court "enumerated several rights that defendant was relinquishing by pleading guilty and concomitantly inquired whether he understood that he also '[gave] up [his] right to appeal this process we're now going through'" but "failed to adequately distinguish defendant's waiver of the right to appeal from those rights which are automatically forfeited upon a plea of guilty") (citing Lopez, 6 N.Y.3d at 256-57; alterations in original).

McKeon is correct that as a matter of New York state law, the record "must establish that the defendant understood that the right to appeal is separate and distinct from those rights automatically forfeited upon a plea of guilty. . . ." Lopez, 6 N.Y.3d at 256; see also id. at 256-57. However, federal habeas relief is not available to redress mere errors of state law. Estelle v. McGuire, 502 U.S.

62, 67 (1991) (citations omitted). McKeon has not cited, nor is the Court aware of, any federal precedent standing for the proposition that the trial court must employ specific language when apprising a defendant pleading guilty of the individual rights relinquished. Accordingly, McKeon has not alleged an error of constitutional magnitude redressable in this habeas proceeding. Accord, e.g., Salaam v. Giambruno, 559 F. Supp.2d 292, 298 (W.D.N.Y. 2008) (finding petitioner's claim that his appellate-rights waiver was invalid because the trial court "did not ask petitioner to explain in his own words his understanding of what this waiver meant" did not state a basis for habeas relief); Nicholas v. Smith, No. 02 CV 6411(ARR), 2007 WL 1213417, at *10-11 (E.D.N.Y. Apr. 24, 2007) ("[W]hile petitioner's argument that the appeal waiver was invalid may have some basis in New York law, petitioner has not demonstrated that the enforcement of the waiver denied him of any rights under the federal Constitution[.]").

   **B.   Ground Two: Involuntary Guilty Plea**

   When Petitioner recited the events leading up to the homicide, he described a physical confrontation in his home, initiated by the victim. According to Petitioner, the victim was "yelling and screaming and throwing things and hitting [him] and trying to burn [him] with cigarettes." Petitioner asserted that he "was defending [him]self." Upon hearing this, Judge Punch erroneously advised Petitioner that even though he was in his home, he could not use

deadly force when he still had the ability to retreat. P.15. Judge Noonan, who presided over subsequent proceedings in Petitioner's case, noted that this was an incorrect statement of the law on justification.

Petitioner argues that Judge Punch's misstatement of the law tainted the proceedings and undermined his ability to explore a viable affirmative defense before entering his plea. Depending upon what the victim was throwing at him, how and where she was striking him, and what threats she may have been making, Petitioner asserts, he may have reasonably believed that his life was in danger and that his actions were justified under the law. He asserts that Judge Punch did not conduct a sufficient inquiry on the record to ascertain the material facts relevant to a potential defense.

The Appellate Division held that McKeon had "failed to preserve" his claim that his plea was not knowingly and voluntarily entered "by failing to move to withdraw his guilty plea or to vacate the judgment of conviction on that ground." 78 A.D.3d at 1618 (citation omitted). The Appellate Division found that contention, in the alternative, to be without merit. Id. Although Judge Punch "mistakenly advised him concerning his duty to retreat[,]" the "error did not render the plea invalid[,]" because McKeon "did not indicate in his recitation of the facts underlying the crime that he reasonably believed that the victim was using or was about to use deadly physical force." Id. (citing N.Y. PENAL LAW

§ 35.15 (2)(a); other citations omitted). This conclusion was not incorrect as a matter of federal law.

A guilty plea will be upheld as constitutional if it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). Accordingly, a petitioner must receive "real notice of the true nature of the charge against him[.]" Henderson v. Morgan, 426 U.S. 637, 645 (1976). It is incumbent on the trial court to "assure that the plea is entered voluntarily and represents an intelligent choice between the different courses open to a defendant[,]" but "[w]hen a defendant fails to bring any matter to the trial court's attention, such as a denial of guilt, that would suggest the need for a factual inquiry, one is not required." Tate v. Wood, 963 F.2d 20, 23 (2d Cir. 1992) (citing Panuccio v. Kelly, 927 F.2d 106, 110-11 (2d Cir. 1991); Willbright v. Smith, 745 F.2d 779, 780 (2d Cir. 1984) (per curiam)); see also Ames v. New York State Div. of Parole, 772 F.2d 13, 15 (2d Cir. 1985) ("Due process . . . does not require that a defendant be advised of every basis on which he might escape or receive a lesser punishment for an offense that he has committed[,] particularly where the burden of persuasion with respect to the appropriate defense rests on the defendant.").

Under New York law, a person may not raise a justification defense to his use of deadly force unless he "reasonably believes

that such other person is using or about to use deadly physical force." N.Y. PENAL LAW § 35.15(2)(a). "If a defendant who is confronted with deadly physical force knows he can retreat with complete safety but fails to do so, the justification defense is lost." Jackson v. Edwards, 404 F.3d 612, 623 (2d Cir. 2005) (citing In re Y.K., 87 N.Y.2d 430, 434 (1996); N.Y. PENAL LAW § 35.15(2)(a)). If, however, a defendant is not the initial aggressor and is attacked within his dwelling, he is not required to retreat. N.Y. PENAL LAW § 35.15(2)(a)(i). Because the use of deadly physical force in this case occurred while McKeon was in his own home, the duty to retreat did not apply. See id.

Nevertheless, as the Appellate Division concluded, justification was not a viable defense based upon Petitioner's own statements during the plea colloquy. Notably, McKeon specifically allocuted to the fact that he did not need to use deadly physical force to "get out of" his house and remove himself from the argument he was having with the victim. P.9. Judge Punch asked Petitioner whether he had to "kill her" in order to defend himself, and Petitioner replied, "I guess not." P.9. Therefore, the Court agrees with Respondent that the knowing and voluntary nature of Petitioner's plea was not affected by Judge Punch's misstatement because Petitioner's own description of the events antecedent to the murder precluded him from raising a defense of justification. In other words, the error by Judge Punch in failing to acknowledge

the "dwelling" exception to the duty-to-retreat was harmless. See Diaz v. Mantello, 115 F. Supp.2d 411, 414 (S.D.N.Y. 2000) (rejecting plea court's misstatement regarding the count to which petitioner was pleading guilty as basis for habeas relief; error was harmless and had no effect on the validity of the plea).

### C.   Ground Three: Invalidity of the Search Warrant

The police originally submitted a written application for a search warrant which incorrectly described Petitioner's residence as being located along Route 40 instead of Route 240. When the affiant-police officer realized the error and contacted the issuing judge, by telephone, the judge simply told him to insert the proper address and initial the correction. The police officer did not recall being placed under oath during the telephone call. McKeon argues that the police officer either was offering oral testimony in support of the original written application or he was making an oral application for a new warrant. In either case, McKeon contends, his testimony should have been taken under oath and recorded for later review, and the failure to do so rendered the warrant defective.

Because Petitioner had a full and fair opportunity to litigate this Fourth Amendment claim, he may not seek redress by means of a petition for a writ of habeas corpus. See Stone v. Powell, 428 U.S. 465, 481-82 (1976) ("[W]here the State has provided an opportunity for full and fair litigation of the Fourth Amendment claim, the

Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."); <u>accord</u>, <u>e.g.</u>, <u>Gates v. Henderson</u>, 568 F.2d 830, 837 (2d Cir. 1977) (<u>en</u> <u>banc</u>).

In order to bring his case outside the purview of <u>Stone v. Powell</u>, <u>supra</u>, McKeon must show that the State of New York failed to provided him with the "opportunity for full and fair litigation of his Fourth Amendment claim." <u>Gates</u>, 568 F.2d at 837. This showing cannot be made on the present record. Indeed, Petitioner took full advantage of the statutory mechanism provided under New York state law for litigating suppression claims. He received a hearing before the trial court regarding his claim that the search warrant was improperly amended, <u>see</u> H.103-28, and the court rendered a written decision. <u>See</u> Resp't Ex. M. McKeon's appellate counsel subsequently argued the merits of the issue on direct appeal. Clearly, he received a full and fair opportunity to litigate his Fourth Amendment claim in the state court. Further review by this habeas court therefore is unavailable.

### D.   Ground Four: Erroneous Admission of Petitioner's Statements to the Police

#### 1.   Overview

Petitioner claims that certain statements he made initially should have been suppressed because the police obtained them during a custodial interrogation without having first apprised Petitioner

of his Miranda rights. Petitioner also claims that because his first statements were tainted by the police officers' failure to administer Miranda warnings, his subsequent, warned statements also should have been suppressed.

Following the suppression hearing, the trial court ruled from the bench that with regard to the pre-Miranda statements, "the defendant was not in custody, and no reasonable person would assume that his liberty was restrained based on the facts as they were presented." H.102. The trial court found that the post-Miranda statements likewise were non-custodial, but "[i]n the event they were to be considered custodial[,]" the trial court found that "the Miranda warnings were adequately given and waived." Id.

The Appellate Division declined to review Petitioner's Miranda claims, finding that they were encompassed by his appellate-rights waiver. McKeon, 78 A.D.3d at 1618 (citation omitted). Given that Petitioner has challenged the validity of his waiver, this Court will address the merits of the Miranda claims.

### 2.   Pre-Miranda Statements

"Miranda stated that its requirements apply to 'custodial interrogation,' which the [Supreme] Court explained was 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" Cruz v. Miller, 255 F.3d 77, 81 (2d Cir. 2001) (quoting Miranda, 384 U.S. at 444). The Supreme

Court also observed that its decision in <u>Miranda</u> was not meant to apply to "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process." 384 U.S. at 477. In <u>Oregon v. Mathiason</u>, 429 U.S. 492 (1977) (<u>per curiam</u>), the Supreme Court clarified that <u>Miranda</u> warnings are not required simply because "the questioning took place in a 'coercive environment.'" <u>Id.</u> at 495. "<u>Miranda</u> did not . . . establish that police questioning of a suspect at the station house is always custodial." <u>Howes v. Fields</u>, ___ U.S. ___, 132 S.Ct. 1181, 1188 (2012) (citing <u>Mathiason</u>, 429 U.S. at 495 (declining to find that <u>Miranda</u> warnings are required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect")). The Supreme Court explained in <u>Howes</u> that

> [i]n determining whether a person is in custody . . . , the initial step is to ascertain whether, in light of "the objective circumstances of the interrogation," <u>Stansbury v. California</u>, 511 U.S. 318, 322–323, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (<u>per curiam</u>), a "reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." <u>Thompson v. Keohane</u>, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

<u>Howes</u>, ___ U.S. at ___, 132 S. Ct. at 1189. In order to determine how a suspect would have assessed his ability to terminate the interview, courts must examine all of the relevant circumstances, including the location of the questioning, its duration, statements made during the interview, the presence or absence of physical

-22-

restraints during the questioning, and the release of the interviewee at the end of the questioning. Id. (citations omitted).

Petitioner's argument regarding the pre-Miranda statements relies on a brief portion of Inv. Sacco's hearing testimony on cross-examination:

> Q.  Did Mr. McKeon say before he left the house, I have got to report for work tonight at 11:00?
> A.  I think at one point he had indicated what time he had to go to work.
> Q.  He indicated concern didn't he, because he knew he would have to come back home to get items to take to work up in Buffalo; true?
> A.  That could be, yes.
> Q.  You knew that he was a police officer working security at Buffalo State College?
> A.  Yes.
> Q.  And he wanted to know if he was going to go to Machias to talk further and come back, if he would have enough time; true?
> A.  At one point he asked me if he was in trouble and if he was going to come back. I'm not sure what I told him. But I did tell him that we are going to the state police barracks.
> Q.  You don't recall if you told him he was in trouble or not?
> A.  He asked me if he was in trouble and if he was coming back.
> Q.  But did you answer that question?
> A.  If I did, I don't recall what I told him.

H.73-74. Petitioner argues that because he specifically asked the police officers if he was in trouble and if he would be permitted to return home after accompanying them to the police barracks, he expressly advised the police that he did not feel free to decline their request. Thus, Petitioner argues, the police should have advised him of his Miranda rights before proceeding further.

-23-

However, as Petitioner concedes, the <u>Miranda</u> standard is an objective, not a subjective, one. Under the circumstances present here, Petitioner objectively could not have believed that he was in custody when he asked whether he was "in trouble and if he was coming back [to his house]." H.74. Petitioner was in his own home at the time, and he had not been arrested. Neither of the investigators told Petitioner that he was required to accompany them to the police barracks. Instead, they asked Petitioner to come with them for purposes of giving a statement to assist in their investigation into the whereabouts of Petitioner's missing live-in girlfriend. In addition, Petitioner had not made any statements to the investigators during their conversation at his house that were incriminating or would have provided probable cause to arrest him. Moreover, Petitioner rode to the police barracks unrestrained in the front seat of the officers' car. While at the barracks, he was not restrained in any way and was provided cigarettes and beverages. Finally, Petitioner was never told that he was under arrest or that he was not free to leave the barracks. <u>See</u>, <u>e.g.</u>, <u>Maine v. Thibodeau</u>, 478 U.S. 1144, 1146 (1986) (holding that defendant who voluntarily accompanied the officers to the police station, who was never told that he was not free to leave, and who was never physically restrained or threatened, was not in custody); <u>see also</u> <u>Maldonado v. Greiner</u>, No. 01 Civ. 0799, 2003 WL 22435713, at *21 (S.D.N.Y. Oct. 28, 2003) (holding that petitioner who was

not under arrest or required to go to the police precinct, who agreed to accompany the police officers to the precinct and did so unrestrained, who was not told that he could not leave, and who was questioned for 60 to 80 minutes over the course of 13 hours, was not in custody).

Even under a subjective analysis, the same conclusion is compelled. Petitioner, as a veteran police officer, plainly knew that he was free to decline the request to go to the barracks or to stop talking to the investigations. During his subsequent conversations with the police, when he was asked if he understood the _Miranda_ warnings, Petitioner essentially told the investigators stated that as a police officer, he well understood their import.

### 2. Post-_Miranda_ Statements

As noted above, the suppression court found that Petitioner was properly advised of his _Miranda_ rights prior to any custodial interrogation, and knowingly and voluntarily waived those rights. Petitioner has presented no evidence, much less clear and convincing evidence, _see_ 28 U.S.C. § 2254(e)(1), for his claim that the suppression court's finding was erroneous. Indeed, the suppression court's finding is amply supported by the record. In light of this factual determination that Petitioner was advised of his _Miranda_ rights prior to giving his recorded statement, there is no "pre-_Miranda_ statement" that could have tainted his post-_Miranda_ statement. _Tibbs v. Greiner_, 01-Civ-4319, 2003 WL 1878075, at *7,

*11 (Apr. 16, 2003) ("Because this Court finds that Tibbs was not subject to any pre-<u>Miranda</u> interrogation, his habeas claims that pre-<u>Miranda</u> statements tainted his post-<u>Miranda</u> statements should be denied.") (internal citation to record omitted), <u>report and recommendation adopted</u> (S.D.N.Y. July 2, 2003) (unpublished opn.).

In any event, the Supreme Court has stated that "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of Miranda, was voluntary." <u>Oregon v. Elstad</u>, 470 U.S. 298, 318 (1985). The "relevant inquiry" is whether the second statement also was voluntarily made, <u>id.</u>, as it was in McKeon's case. Under these circumstances, the Supreme Court has declined to "imput[e] 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver" of <u>Miranda</u> rights. <u>Id.</u> (holding that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite <u>Miranda</u> warnings").

**E.   Ground Five: Erroneous Issuance of Orders of Protection**

McKeon argues that because the victim's family members did not testify against him or witness the crime, the sentencing court erroneously issued protective orders in their favor under New York Criminal Procedure Law ("C.P.L. § 530.13), the statute governing the procedure for issuing orders of protection for non-family offenses. The Appellate Division declined to consider this

argument, finding that it was not preserved. McKeon, 78 A.D.3d at 1618.

Respondent argues, inter alia, that the protective orders are not a sufficient restraint on Petitioner's liberty to meet the "in custody" requirement of the habeas statute, see 28 U.S.C. § 2254(a); and that McKeon merely alleges an error of state law not cognizable in this federal habeas proceeding.

Even assuming arguendo that McKeon had satisfied the jurisdictional "in custody" requirement of 28 U.S.C. § 2254(a), the Court would not be able to grant habeas relief on this claim. McKeon contends that the protective orders were unauthorized because the family members in whose favor the orders issued were not witnesses to the crime and did not testify at any trial. Under New York law, C.P.L. § 530.13(4) "authorizes a court to issue a permanent order of protection in favor of a victim or witness in a criminal action." People v. Konieczny, 780 N.Y.S.2d 546, 813 N.E.2d 626, 626 (N.Y. 2004). A court "cannot rely on [C.P.L. §] 530.13 to issue an order of protection for a party unrelated to the underlying criminal action." Id. (emphasis added). Petitioner is correct that the family members in question were not witnesses or named victims in this case. Therefore, the orders of protection should not have been issued pursuant to C.P.L. § 530.14, and they are defective. See Konieczny, 813 N.E.2d at 626; Dewall v. Superintendent, Mohawk Corr. Fac., No. 05-CV-5583 (NGG)(RLM), 2008

WL 3887603, at *17 (E.D.N.Y. Aug. 20, 2008) (finding that orders of protection in favor of non-witnesses to the trial, a woman who testified only at the sentencing hearing and her daughter, were defective under C.P.L. § 530.13(4) (citation omitted).

Neverthless, the defective orders of protection had no impact on McKeon's sentence. An "order of protection issued incident to a criminal proceeding . . . is not a part of the sentence imposed." People v. Nieves, 2 N.Y.3d 310, 778 N.Y.S.2d 751, 811 N.E.2d 13, 13 (N.Y. 2004) (holding that orders of protection are merely "ameliorative measure[s] intended to safeguard the rights of victims and witnesses both prior to and after conviction"). Additionally, defective orders of protection "do not render [a defendant's] sentence of incarceration invalid." Id. Thus, under Nieves, the defective orders of protection in this case do not render McKeon's sentence invalid. Id.

As noted above, this Court is limited to deciding whether a conviction "violated the Constitution, laws, or treaties of the United States." McGuire, 502 U.S. at 67-68. McKeon's argument impermissibly seeks to repackage an error of state statutory law as a federal constitutional matter. See Johnson v. Rosemeyer, 117 F.3d 104, 111 (3d Cir. 1997) (stating that alleged "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause") (cited in DiGuglielmo v. Smith, 366 F.3d 130, 136 (2d Cir. 2004)). The orders of protection, although defective under

New York state law, do not infringe on any rights guaranteed by the federal constitution. See Dewall, 2008 WL 3887603, at *17 (finding that orders of protection did not violate petitioner's constitutional due process rights under the Confrontation Clause to face his accusers where neither individual had been witnesses at petitioner's trial).

## IV.  Motion to Stay

After Respondent answered the petition and interposed the defenses of non-exhaustion and procedural default, Petitioner filed a motion to stay (Dkt #9) on or about August 1, 2012. Petitioner asked the Court to hold the petition in abeyance so that he could return to state court to exhaust the "unpreserved issues". Dkt #9 at 1. Petitioner asserted that defense counsel was ineffective for failing to "fairly present" the claims in constitutional terms on appeal and in failing to make the appropriate objections to preserve Grounds Two and Five. Id. at 1-2. As directed by the Court (McCarthy, M.J.), Respondent filed a responsive pleading in which he argued that the motion to stay should be denied because the petition is not a "mixed petition."

The Court agrees with Respondent that the petition is not a mixed petition, that is, it does not contain any truly unexhausted claims. All of the unexhausted claims (Grounds One, Two, and Five) pertain to matters that appear on the trial record. They cannot be raised in a collateral proceeding in state court because the court

would be required to dismiss them. <u>See</u> N.Y. CRIM. PROC. LAW § 440.10(2)(c) (mandating that the state court deny any C.P.L. § 440.10 motion where the defendant unjustifiably failed to raise a claim on direct appeal despite a sufficient record to do so). McKeon has already used the one direct appeal to which he is entitled under New York state law. <u>See</u> N.Y. R. CT. § 500.20(a)(2) (providing that a leave letter seeking permission to appeal to the New York Court of Appeals must indicate that "that no application for the same relief has been addressed to a justice of the Appellate Division, as only one application is available"). Accordingly, McKeon no longer has any available state-court remedies, and the claims must be deemed exhausted. <u>See</u>, <u>e.g.</u>, <u>Bossett v. Walker</u>, 41 F.3d 825, 828 (2d Cir. 1994) ("[I]f the petitioner no longer has 'remedies available' in the state courts under 28 U.S.C. § 2254(b), we deem the claims exhausted."); <u>see also</u> <u>Grey v. Hoke</u>, 933 F.2d 117, 120-21 (2d Cir. 1991).

As the petition contains no unexhausted claims for which remedies remain available in the state court system, there is no need to invoke the stay-and-abeyance procedure. Accordingly, Petitioner's motion to stay is denied.

## V.  Conclusion

For the foregoing reasons, Petitioner's motion to stay (Dkt #9) is denied with prejudice. Petitioner's request for a writ of habeas corpus is denied, and the petition (Dkt #1) is dismissed.

Because Petitioner has failed to make a substantial showing of the denial of a constitutional right, no certificate of appealability shall issue. <u>See</u> 28 U.S.C. § 2253(c)(2). The Clerk of the Court is requested to close this case.

      **SO ORDERED.**

                               S/Michael A. Telesca

                              _____
                               HONORABLE MICHAEL A. TELESCA
                               United States District Judge

Dated:     October 29, 2013
           Rochester, New York